SAMUEL R. PERCY

*vs.*

LEWISTON, AUGUSTA & WATERVILLE STREET RAILWAY.

Sagadahoc.    Opinion February 27, 1915.

*Appeal.    Approval.    Constitutional Law.    Equity.    Injunction,    Jurisdiction.    Public Convenience.    R. S., Chap. 53, Sec. 9.    Stockholder.    Street.*

1.   The construction by a street railroad company of additional turnouts in a street is unlawful, unless the approval of the municipal officers is first obtained.

2.   In a petition by a street railroad company to municipal officers to approve additional turnouts in a street, under R. S., Chap. 53, Sec. 9, it is not necessary to allege that public convenience or necessity requires them.

3.   The approval by a board of mayor and aldermen of additional turnouts on the petition of a street railroad company is not rendered invalid by the fact that the mayor was interested as president of a corporation to be benefited thereby, when it appears that the mayor took no part in the proceedings except to present the petition.

4.   By statute, all street railroad corporations, both those specially chartered and those organized under the general laws, have authority to do a freight business.

5.   The right granted to a street railroad company to haul freight in cars imposes no additional servitude upon the land in the street on which its line is located, for which the owner of the land is constitutionally entitled to compensation, more than was awarded when the street was originally laid out.

6.   A street railroad company has no right to use the public highway as a switching yard, and is not entitled to a turnout for that purpose, nor for the purpose of affording a standing place for its cars, nor for its mere business convenience.

7.   An injunction may be granted to prevent a threatened wrong for which there is no adequate remedy at law, although the rights of the parties have not been settled by an action at law.

8.   The plaintiff is entitled to an injunction restraining the defendant from using the proposed turnout as a switching or shifting place.

On appeal by the plaintiff.    Decree below reversed.    Bill sustained with costs.    Decree in accordance with opinion.

This is a bill in equity, in which the plaintiff seeks to enjoin the defendant from constructing a turnout or spur track extending from the Maine Central Railroad's track along Washington Street, in Bath, in the county of Sagadahoc, to the plant of the Bath Box Company. The defendant filed an answer to the bill and the plaintiff filed a replication. At the conclusion of hearing in said cause, the Justice presiding ordered the bill dismissed without costs, from which order the plaintiff claimed and took an appeal.

The case is stated in the opinion.

*E. C. Plummer, and George W. Heselton, with him,* for plaintiff.

*Newell & Woodside, and W. B. Skelton,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, HANSON, JJ.

SAVAGE, C. J. Bill for an injunction to restrain the defendant company from lengthening a turnout in its line in front of the plaintiff's residence on Washington Street, in Bath. An injunction was denied by the sitting Justice, and the case comes before us upon the plaintiff's appeal.

The plaintiff owns the fee in the street. There is already a turnout at the point in question of sufficient length to enable cars going in opposite directions to pass each other conveniently. The defendant proposes to extend the turnout to the length of 287 feet. The particular purpose of the defendant is to take freight cars, two at a time, from the Maine Central Railroad yard in Bath, over a connecting spur track to its own line, then push them with a motor car onto the proposed turnout, unshackle the motor car, then back it over the turnout switch, then proceed forward over the other line of the turnout beyond the forward switch, then back to the standing freight cars, then shackle on, and haul them to their destination. And the only destination now in contemplation is the plant of the Bath Box Company. In short, the design is to facilitate the transfer of freight in freight cars from the Maine Central Railroad to the Bath Box Company, in the manner stated. It is proposed to make the switch long enough to accommodate a motor car, two freight cars and a passenger car, and to enable the defendant to shift and switch cars by means of the lengthened turnout. This appears to be the sole reason for lengthening the turnout. To sum it up, the defendant proposes to make a switching yard of the street, to the extent indicated.

The plaintiff's residence is Washington Street at the corner of Union Street. Union Street debouches into Washington Street against the turnout. The entrance to the plaintiff's premises with teams is on the Union Street side. And he contends that the use of the proposed turnout will in an especial manner add to his inconvenience and risks of travel, as he may pass to and from Union Street onto Washington Street. He also contends that the construction and proposed use of the turnout will depreciate the value of his property. And for these reasons he claims the right to institute these proceedings in his own behalf.

The board of mayor and aldermen of Bath, the mayor not acting, have voted to approve the proposed turnout,

The plaintiff's points are these: 1, that the construction of the proposed turnout would be unlawful, unless the valid approval of the municipal officers of the city of Bath was first obtained. R. S., Chap. 53, Sec. 9; 2, that the approval obtained was invalid because the board of mayor and aldermen of Bath had no jurisdiction to approve the turnout, inasmuch as the defendant's petition therefor did not allege that public convenience and necessity required it, but merely, on the contrary, that the Bath Box Company desired to make track connection between the petitioner's track and the track, of the Maine Central Railroad Company, to transport steam railroad cars between the Box Company's property and the Maine Central Railroad; 3, that the approval of the board of mayor and aldermen was void because the mayor was a stockholder in and president of the Bath Box Company; 4, that the defendant has no authority to haul freight cars, and especially steam railroad freight cars, over its line, and hence that it has no right to a turnout to facilitate such uses of its road; and 5, that it has no right in any event to use the public highway for such switching purposes as it proposes.

I. The first contention is sound.

II. The next point is not tenable. The statute, R. S., Chap. 53, Sec. 9, provides that "when the location of any street railroad has been approved as provided by law, the municipal officers may approve such additional locations for turnouts and spurs to property used or to be used by said corporation in the operation of its road as shall be necessary therefor." And it is implied of course that without such approval, the corporation cannot lawfully construct the turnouts. But the statute does not require any formalities of petition. It does

not even require a formal petition at all. Jurisdiction of municipal officers is not limited to cases alleged to be of public necessity or convenience. The question of public necessity or convenience of the general location is settled by the approval of the railroad commissioners. R. S., Chap. 53, Sec. 7. The question of the public necessity or convenience of the location having been thus settled, the subsequent construction of turnouts is merely incident to the general power of construction.

III. The third point is equally untenable. Assuming that the ownership of stock in the Bath Box Company would disqualify the mayor from acting on the approval of a location for a turnout, in which his company was specially interested, it appears in this case that the mayor did not vote on the question of approval, and it does not appear that in any way he took part in the proceedings, except to present the petition. His disqualification did not prevent the other municipal officers from acting, nor did it invalidate their proceedings.

IV. As to the authority of the defendant to transport freight, and for that purpose to haul freight cars over its line. The defendant is a street railroad company. There is much authority to the effect that, in a popular, as well as a technical sense, a street railway is a railway for the transient transportation of passengers, and not of freight, and, therefore, that in the absence of statutory authority, a street railroad is not authorized to do a freight business. *Omaha & C. B. St. Co.* v. *Interstate Commerce Commission*, 230 U. S., 324; *South & N. A. R. Co.* v. *Highland Ave. & B. R. Co.*, 119 Ala., 105; *Hannah* v. *Met. St. R. Co.*, 81 Mo., App. 78; *Williams* v. *City Electric Railway*, 41 Fed., 556; *Louisville & P. R. Co.* v. *Louisville City R. Co.*, 2 Duv., 175; Elliott on Roads & Streets, 3rd. Ed. Sec. 927. We shall assume this proposition to be correct, and shall inquire whether the defendant has statute authority.

The defendant is the successor, in the city of Bath, to the rights and franchises of the Bath Street Railway Company. The latter company was chartered by the legislature. Priv. and Spec. Laws, 1889, Chap. 374. The charter provided that the corporation should have "authority to construct, maintain and use a street railway to be operated by electricity or animal power." In this connection no specific reference was made either to passengers or freight. But in another connection it was provided that "said corporation shall

have power from time to time to fix such rates of compensation for transporting persons or property, as it may think expedient;" and further that "said road shall have all the rights and be subject to all the liabilities of horse railroads in this state." It may be noticed that at the time this charter was granted, horse power, and not electric power, was in general use in this State for the moving of street cars. The street railroads were horse railroads, and in popular parlance were so called. The term "horse railroad" in the statute meant, and should be interpreted as meaning, "street railroad."

The grant of power to fix compensation for transporting "persons or property," affords a strong implication, we think, that under the charter the power of transporting both persons and property was intended to be granted. But we go further. Not only does the charter, as we have seen, declare that this corporation should have all the rights of street railroads in this State, but the general statutes, R. S., Chap. 53, Sec. 1, also provide that "all street railroad corporations shall, in addition to their chartered rights, have all the rights and powers conferred from time to time by general laws upon street railroad corporations." And the following section, section 2, which is a part of the general law relating to the organization of street railroad corporations, states the purpose for which such corporations may be organized to be "the constructing, maintaining and operating . . . a street railroad for public use, for street traffic for the conveyance of persons and property." There can be no doubt that a street railroad corporation organized under this general law has the power to do a freight business over its lines.

The question now arises, whether the language in section 1 is broad enough to cover, and was intended to cover, the exercise of powers granted in their very incorporation to corporations organized under the general law. In other words, is it the purpose of the statute to give to all street railroad corporations, both those specially chartered and those organized under the general laws, the same rights and powers, to place them all on the same basis, whatever the limit of chartered powers may have been? We think that is the purpose. The language has little significance otherwise. And we conclude that the defendant has statutory authority to do a freight business.

The doctrine that the grant of the power to construct and operate a street railroad along a highway imposes no additional servitude for which the abutting owner is entitled to additional compensation

is not denied by the plaintiff. This doctrine has been thoroughly elucidated in the modern cases of *Briggs* v. *Railroad*, 79 Maine, 363, and *Taylor* v. *Railway*, 91 Maine, 193, and the reasons for the doctrine need not be repeated here. But it is suggested in argument that the rule is, or ought to be, different, when a street railroad company is authorized to transport freight in freight cars, especially in the freight cars of a steam railroad company. We do not think so. The reasons given in the Briggs and Taylor cases why the changed methods of transportation of passengers do not result in an additional servitude apply with equal force to changed methods in transporting property. The right of public travel includes the right to transport property in drays and wagons. To transport it in cars is but another, and more modern, way of transporting it. And in the Taylor case the court said,—"It is no matter whether the vehicle carries passengers or freight or passes intelligence along its contrivance." So that we think the right to haul freight in cars, if the right exists, imposes no additional servitude upon the land in a street over which the railroad runs, and affords no reason for saying that the legislative grant of the right is unconstitutional, as impinging upon the constitutional provision which forbids the taking of private property for public uses without just compensation.

But the plaintiff contends that even if the defendant has the statutory power to transport freight in cars over its line that the statute does not contemplate that it may make a rail connection with a steam railroad company and transport the cars of that company along the public ways. And, as already stated, it is the admitted purpose of the defendant to transport steam railroad freight cars, two at a time, along its line and over the proposed turnout.

The statute places no limit upon the means to be used in the transportation of property. If it may be carried at all, from the nature of the case it must be carried in or upon cars. If it is to be carried in a car, we can see no logical or legal difference whether it is carried in one of the defendant's own cars, or in a car of another company which can run over its tracks. If it can transport one car, we can perceive no legal reason why it may not transport one or two cars hauled by a motor car. The argument of the plaintiff to the contrary is largely addressed to the question of policy. But with that we have nothing to do. When the legislature has made an unqualified and unlimited grant of power, the court cannot question the

good policy of the enactment. The grant under which this defendant has the right to transport property is unqualified and unlimited in its terms. If the exercise of the power is found to be detrimental to public interests, or contrary to good policy, the legislature has the authority to place such limitations upon it as it deems best. The court has no such power.

V. Lastly, the plaintiff contends that even if the defendant has the authority to transport property in steam railroad freight cars, it has no right to use the public highway as a switching yard, and that it is not entitled to a turnout for that purpose, nor for the purpose of affording a standing place for cars. We think the contention is sound. Streets are subject only to public uses. They are made to travel in. They are not made as places for public trade or business, except business necessarily incident to travel. They are made to enable the public, on foot, in carriages, or carts, or cars, with or without their wares and merchandises, to pass and repass. For these public uses the public has compensated the owner of the land, has constructed the road, and maintained it. To permit the transportation of passengers and freight along the way is not an additional use, but an extension of the use for which the way was laid out. But to permit the way to be used for the mere business convenience of persons or corporations would be a perversion of its proper use. It might be convenient for the defendant to use the street as a switching or shifting place for its motors and cars. It might be that its business would be facilitated thereby. But a public way was not constructed, and is not maintained, for that purpose.

The defendant cites *Tracy* v. *LeBlanc*, 89 Maine, 304, to the effect that the bill cannot be maintained, because there is a complete and adequate remedy at law. Not so in this case. Here it is a threatened, not a completed wrong, and one for which there is no remedy at law which would be adequate. This is a sufficient ground for equitable restraint by injunction. *Wilson* v. *Harrisburg*, 107 Maine, 207.

Having reference to the location of the plaintiff's premises, and the means of ingress to and egress from the premises from and to Washington Street, we think the plaintiff would sustain a special damage from the threatened use of the turnout, beyond the damage to the public in general, such as entitles him to relief in this proceeding.

Since the sole object of lengthening the turnout seems to be to enable the defendant to use it as a switching or shifting place, it should be restrained from that use. The specific relief sought by the bill is to enjoin the defendant from extending the turnout. The relief to which the plaintiff is entitled is a restraint from the proposed use of it, which we have described, after it shall be constructed. And this relief we think may be granted under the general prayer for relief. A decree may be made by a single Justice in accordance with this opinion.

*Decree below reversed.*
*Bill sustained with costs.*
*Decree in accordance with the opinion.*