**Phillip NAPIER, Plaintiff, Appellant,**

v.

**TOWN OF WINDHAM, Richard Lewsen, Richard Ramsdell, and Ronald Ramsdell, Defendants, Appellees.**

No. 98–2235.

United States Court of Appeals,
First Circuit.

Heard June 7, 1999.

Decided Aug. 6, 1999.

Stuart W. Tisdale, Jr., with whom Mary A. Davis and Tisdale & Davis, P.A. were on brief, for appellant.

William R. Fisher, with whom William R. Fisher, P.A. was on brief, for appellee.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

TORRUELLA, Chief Judge.

Plaintiff-appellant Phillip Napier was shot by defendant-appellee Ronald Ramsdell ("Ronald") of the Windham Police Department during a response call at Napier's home by Ronald and his brother, defendant-appellee Richard Ramsdell ("Richard"). Napier brought suit against the Ramsdells, the Town of Windham, Maine ("the Town"), and Chief of Police Richard Lewsen, alleging state and federal civil rights claims and state law claims for assault, battery, and negligence. The district court adopted the magistrate's recommendation of summary judgment in favor of all defendants on all claims, and Napier appeals. We affirm in part and reverse in part.

## BACKGROUND

On April 19, 1995, Phillip Napier was at his home, a converted hunting camp on the shores of Highland Lake in Windham, Maine. At approximately 6:00 p.m., Napier fired a rifle several times from his porch into a woodpile about fifteen feet away. A neighbor shouted to Napier and asked what was happening, to which Napier responded that he was getting rid of some old ammunition. The neighbor walked back inside his own house, and Napier continued to shoot into the woodpile. Meanwhile, the Windham Police Department received at least one telephone call from Napier's neighbors, complaining that Napier was firing a weapon from his home.

Officer Richard Ramsdell responded to the complaint by driving to Napier's house. While driving, he radioed his brother, Sergeant Ronald Ramsdell, and asked for backup assistance. The police dispatcher told both officers that Napier was "possibly 1044," the code for "mentally disturbed." Richard arrived first at Napier's house and parked his car partially in Napier's driveway.

This is where the parties' versions of the events diverge. Defendants claim that Richard cautiously approached Napier's home with his sidearm holstered and determined that Napier was not outside the house. Richard then waited for Ronald to arrive, at which time Richard walked toward the open front door with his hand on his still-holstered sidearm. Richard yelled, at least twice, "Police department, Phil, are you here?" Richard claims that he looked inside Napier's home and saw a rifle lying on a table and a hand holding a weapon extending out of a doorway inside the house. Richard then repeatedly shouted, "Police, drop the gun," but Napier did not do so. Instead, Napier walked toward Richard with his gun at his hip, pointed at Richard. Concerned for his safety, Richard jumped over a woodpile on the porch and continued to instruct Napier to drop the gun. Napier then stepped into the doorway, still holding the gun. From the driveway, Ronald saw Napier enter the doorway with a gun, so Ronald also shouted, "Police, drop the gun." Defendants claim that Napier leaned over the woodpile and pointed his gun at Richard, inducing Richard to run around the corner of Napier's house and to fire a shot at Napier while he ran. Ronald claims that when Napier raised his weapon toward Richard, Ronald fired a burst of three rounds at Napier. Ronald asserts that Napier then turned toward him with his gun still raised, so Ronald fired three more rounds at him. Napier was struck by one or more of the bullets and fell onto a bed just inside his front door. The Ramsdells then

subdued Napier and placed him under arrest.

Napier disputes this version. According to Napier, Richard attempted to conceal his presence by parking only partially in Napier's driveway and by skirting the house so as not to be detected. Napier claims that Richard did not announce his presence and carefully crept towards the front door with his gun drawn. Napier claims that he stepped out of a sideroom in his house, carrying a .22 revolver in his right hand, pointed downward. Napier then saw Richard standing in his doorway, pointing his gun at Napier. Napier says that he did not point his gun at Richard, but that he did step backwards and lose his balance. Panicking, Richard then jumped over or through a woodpile on the porch and fired a bullet at Napier, even though Napier did not raise his gun or fire a shot. The bullet missed, but Napier immediately came under fire from Ronald Ramsdell, who was standing in the driveway. Ronald fired two bursts of three bullets at Napier, who was hit by shots from the second burst. Napier fell onto a bed just inside the door of his house and pleaded with the officers not to shoot him again. The officers handcuffed Napier and asked him why he shot at them. Napier, falling in and out of consciousness, heard one of the Ramsdells say to the other, "Don't let anyone in."

These disputed accounts first hit the courtroom in Napier's criminal trial. Napier was indicted on five charges arising out of the incident: (1) recklessly creating a substantial risk of serious bodily injury to Richard with a dangerous weapon; (2) intentionally or knowingly placing Richard in fear of imminent bodily injury with a dangerous weapon; (3) discharging a firearm within 100 yards of a dwelling; (4) intentionally or knowingly placing Ronald in fear of imminent bodily injury with a dangerous weapon; and (5) recklessly creating a substantial risk of serious bodily injury to Ronald with a dangerous weapon. Following a jury trial, Napier was convicted of discharging a firearm near a dwelling and of criminal threatening and reckless conduct with regard to Richard Ramsdell, but he was acquitted of the criminal threatening and reckless conduct charges with regard to Ronald Ramsdell. Napier's appeal of his convictions was denied. *See State v. Napier*, 704 A.2d 869 (Me.1998).

On April 19, 1997, Napier filed the present action, alleging six causes of action against Lewsen, the Ramsdells, and the Town. In Count I, Napier claimed under 42 U.S.C. § 1983 that the Ramsdells used excessive force against him in violation of his Fourth Amendment rights. In Counts II and III, Napier alleged that the Town and Chief Lewsen, respectively, were also liable under § 1983 because they failed to properly train and supervise the Ramsdells in the use of deadly force. Count IV alleged that Lewsen and the Ramsdells were liable for Napier's injuries under the state law theories of assault, battery, and negligence. Count V alleged that the Town was vicariously liable for the negligence of Lewsen and the Ramsdells. Finally, Count VI alleged that all defendants were liable under Maine civil rights law "on the same basis that all defendants [we]re liable under ... § 1983."

Proceedings in this action were stayed until the resolution of Napier's criminal appeal on January 8, 1998. Following discovery, all defendants moved for summary judgment. On August 19, 1998, Magistrate Judge David M. Cohen issued a recommended decision on defendants' motion, recommending the entry of summary judgment in favor of all defendants on all counts. On September 8, 1998, Napier filed his objections to the recommended decision and a memorandum of law opposing summary judgment. In a two-page order issued on October 1, 1998, Chief District Judge D. Brock Hornby adopted the recommended decision and granted defendants' motion for summary judgment in its entirety. Judgment entered the following day, and Napier filed a timely notice of appeal.

## DISCUSSION

### I. Summary Judgment Standard

■ Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the onus is on the nonmoving party to present facts that show a genuine issue for trial. *See Serrano–Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 25 (1st Cir.1997); *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 841–42 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(citing Fed.R.Civ.P. 56(e)). "[P]laintiff ... [must] offer[ ] ... 'significant probative evidence tending to support the complaint.'" *Id.* at 256, 106 S.Ct. 2505 (quoting from *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). We review the district court's grant of summary judgment *de novo. See Serrano–Cruz,* 109 F.3d at 25.

### II. Claims Under 42 U.S.C. § 1983

The magistrate recommended the entry of summary judgment in favor of all defendants on Napier's § 1983 claims. The magistrate recommended summary judgment in favor of the Ramsdells based on a determination that a jury could not find that their conduct was so deficient that no reasonable officer could have made the same choices under the circumstances. The magistrate recommended summary judgment in favor of appellee Lewsen on

alternative bases. First, the magistrate found that the lack of a constitutional violation on the part of the Ramsdells precluded any claim for supervisory liability against Lewsen. Second, the magistrate also found that Napier offered no evidence: (1) that Lewsen was put on notice of Fourth Amendment violations prior to the incident involving Napier, or (2) that any act or omission by Lewsen led to the shooting of Napier. Finally, the magistrate recommended the entry of summary judgment in favor of the Town because no constitutional rights were violated by municipal employees. Each recommendation was accepted by the district court.

Napier appeals the judgment disposing of all claims against all parties, but his arguments with respect to the § 1983 claims challenge only the magistrate's determinations concerning the Ramsdells. Therefore, the fate of Napier's appeal of the entry of judgment in favor of Lewsen and the Town on the § 1983 claims rests solely on the fortunes of his arguments concerning the Ramsdells. We turn to those arguments.

### A. Basis For the Magistrate's Recommended Decision

■■ We begin by noting that it is difficult to ascertain from reading the recommended decision whether the magistrate recommended summary judgment in favor of the Ramsdells on the § 1983 claims on the basis of qualified immunity or upon a determination that no jury could find a constitutional deprivation. Appellees raised both arguments in their motion for summary judgment. The magistrate recommended summary judgment because he found that no jury could find the officers' conduct to be "objectively unreasonable." Unfortunately for clarity's sake, the "objective reasonableness" of the officers' conduct is crucial to both the qualified immunity and substantive liability inquiries. The Fourth Amendment inquiry in excessive force cases asks whether the officers' actions are "objectively reason-

able" in light of the facts and circumstances confronting them. *See Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). There are two prongs to the qualified immunity analysis. The first prong is whether the constitutional right in question was clearly established at the time of the alleged violation. *See Swain v. Spinney*, 117 F.3d 1, 9 (1st Cir.1997). In the second prong, the court employs an "objective reasonableness" test in determining whether a reasonable, similarly situated official would understand that the challenged conduct violated the established right. *See id.* Phrased another way, police officers are entitled to qualified immunity if reasonably well-trained officers confronted with similar circumstances could reasonably believe their actions were lawful under clearly established law. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

As a result of these similar inquiries, the magistrate's determination that no jury could find that the Ramsdells' conduct was objectively unreasonable could have been a grant of summary judgment on either qualified immunity or substantive Fourth Amendment grounds. The parties treat the decision as if it was an entry of judgment on alternative bases, so we will also treat it as such. In any event, because what is disputed here is the determination that no jury could find the Ramsdells' conduct to be objectively unreasonable, and not the legal consequences that flow from such a determination, we need not dissect the magistrate's grounds for decision any further. We need only determine whether a genuine issue exists that should have precluded the magistrate from making this determination.

## B. Correctness of the Standard Applied By the Magistrate

■ We next address Napier's claim that the district court applied an incorrect standard in granting summary judgment in favor of the Ramsdells on the § 1983 claim. As identified by Napier, the district court stated that the "relevant inquiry here is whether no reasonable officer could have made the same choice under the circumstances." Napier argues that the standard the court should have applied is whether a jury could find that the Ramsdells' conduct was objectively unreasonable. Napier argues that the district court erroneously required him to fully prove, in order to survive the summary judgment stage, that no reasonable police officer could have done what the Ramsdells did.

In *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 694 (1st Cir.1994), we outlined the constitutional standard for evaluating § 1983 causes of action based upon the use of deadly force. We noted the Supreme Court's instruction in *Graham*, 490 U.S. at 397, 109 S.Ct. 1865, that the constitutionality of the use of deadly force incident to arrest depends solely on whether the officer's conduct was "objectively reasonable." *See Roy*, 42 F.3d at 694. We also recited the qualified immunity test for § 1983 actions as shielding a "reasonable officer" judged by an objective standard. *See id.* (citing *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034). We stated that, although substantive liability and qualified immunity are two separate questions, the Supreme Court employs the same "objective reasonableness" standard for each inquiry. *See id.* at 695. We then applied that "objective reasonableness" standard in determining whether the summary judgment entered in favor of the officer in *Roy* was appropriate. We found that summary judgment was proper because "in our view a jury could not find that [the defendant's] conduct was so deficient that no reasonable officer could have made the same choice." *Id.*

Citing *Roy*, the magistrate here held that "a jury could not find that Richard's conduct was so deficient that no reasonable officer could have made the same choice under the circumstances." This is identical to the standard applied in *Roy*. Turning to the claim against Ronald

Ramsdell, the magistrate stated that the relevant inquiry is "whether Ronald's conduct was so deficient that no reasonable officer could have made the same choice under the circumstances." The magistrate then found that the *Roy* standard was met because "[a] reasonable officer could have made the same choice under the circumstances." The magistrate did not explicitly state that he was continuing to inquire whether a *jury* could make that determination, as opposed to simply making the factual determination himself, but it seems clear from the context that the magistrate correctly applied the summary judgment standard. The magistrate's determination that "[a] reasonable officer could have made the same choice under the circumstances" is the equivalent of making *Roy*'s finding that a jury could not find that no reasonable officer could have made the same choice under the circumstances. The magistrate merely replaced the inartful phrasing of the standard applied in *Roy* with an equivalent standard that omitted the double negative.

Napier cites no authority to counter *Roy*, but complains that if he is required to prove that no reasonable police officer could have made the choices made by the Ramsdells, then he is forced to fully prove the Ramsdells' liability in order to avoid summary judgment. We disagree. Napier need not fully prove liability in order to avoid summary judgment under the standard applied by the magistrate; he need only demonstrate that a reasonable jury could later find that he has proven liability. Identifying those plaintiffs who cannot so demonstrate is one of the purposes of summary judgment. *See Conward v. Cambridge School Committee*, 171 F.3d 12, 18 (1st Cir.1999) ("[The summary judgment] rule acts as a firewall to contain the blaze of cases that are so lacking in either factual foundation or legal merit that trial would be a useless exercise."). Therefore, without commenting yet on the correctness of the magistrate's determinations, we find that the magistrate employed the correct standard in making them.

## C. Objective Reasonableness of the Ramsdells' Conduct

Napier argues that material factual disputes exist that should have prevented the magistrate from determining that a jury could not find that the Ramsdells' conduct was so deficient that no reasonable officer could have made the same choices under the circumstances.

### 1. Richard Ramsdell's Conduct

 With regard to Richard Ramsdell's conduct, the magistrate found that two facts—both of which were conclusively established by Napier's criminal convictions—led to the conclusion that Richard's actions were objectively reasonable. It is "beyond doubt" that issue preclusion applies to a federal civil rights action following a criminal conviction in state court. *See Allen v. McCurry*, 449 U.S. 90, 102, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Glantz v. United States*, 837 F.2d 23, 25 (1st Cir.1988). Because federal courts must give preclusive effect to judgments in state court whenever the courts of the particular state would do so, *see Allen*, 449 U.S. at 115–16, 101 S.Ct. 411, we examine Maine's collateral estoppel rules in this context. In Maine, a prior criminal conviction "conclusively establishes all facts essential to the final judgment of conviction." *Hanover Ins. Co. v. Hayward*, 464 A.2d 156, 160 (Me.1983). The convicted party is precluded from litigating the issues essential to that conviction in subsequent civil actions. *See Beale v. Chisholm*, 626 A.2d 345, 347 (Me.1993).

 The magistrate correctly found two facts to have been established in the criminal action against Napier: (1) that Napier placed Richard in fear of imminent bodily injury with a dangerous weapon, and (2) that Napier recklessly created a substantial risk of serious bodily injury to Richard with a dangerous weapon. These facts were essential to Napier's criminal convictions for criminal threatening with a dan-

gerous weapon and reckless conduct with a dangerous weapon, *see* 17–A M.R.S.A. §§ 209(1) & 211(1), and are therefore established for purposes of Napier's civil rights suit. In light of these established facts, we agree with the magistrate that a jury could not find that Richard's conduct—firing a single shot at Napier while attempting to find cover—was so deficient that no reasonable officer could have made the same choice under the circumstances. *See Roy*, 42 F.3d at 695 (affirming summary judgment in favor of officers who used deadly force on a suspect who threatened them with knives, because no jury could find the officers' conduct to be objectively unreasonable).[1]

### 2. Ronald Ramsdell's First Burst of Bullets

 Ronald Ramsdell's conduct, however, requires closer scrutiny because Napier was acquitted of threatening Ronald and of placing him at risk of serious bodily injury. It is undisputed that Ronald fired two bursts of three bullets each at Napier, and the magistrate analyzed each burst separately. As noted by the magistrate, Ronald testified at Napier's criminal trial that he fired the first three rounds because he thought Napier was going to shoot Richard and that he fired the second three rounds because he thought Napier was going to shoot him.

The magistrate recommended summary judgment with regard to the first burst because he found that a reasonable officer could have made the same choice under the circumstances of witnessing Napier's creation of a substantial risk of serious bodily injury to Richard. Due to the collateral estoppel effect of his criminal conviction, Napier cannot create a genuine issue regarding whether he actually created a substantial risk of serious bodily injury to Richard. What Napier can and does argue on appeal is that there is a genuine issue of material fact regarding whether Ronald knew of or was able to witness that creation of risk.

Napier now claims that Ronald could not see Napier inside the house. However, Napier did not present this argument or any evidence supporting it to the magistrate, so it was not part of the summary judgment record.[2] This alone adequately supports the magistrate's determination. In any event, it would not matter if Napier had claimed that Ronald could not have seen Napier inside the house because Ronald did not claim to have been able to do so. To the contrary, Ronald specifically testified that he could not see Napier when Napier was inside. All parties agree that, when Richard jumped behind the woodpile, Napier came to the open doorway of the house. Whether Ronald could see into the

---

1. Maine's deadly force statute is also instructive in determining the reasonableness of Richard's actions. That statute authorizes the use of deadly force by law enforcement officers when the officer reasonably believes that such force is necessary to defend himself or a third person from what he reasonably believes is the imminent use of deadly force. *See* 17–A M.R.S.A. § 107(2)(a). Napier's convictions established that Napier: (1) threatened Richard with a dangerous weapon, and (2) placed him at risk of serious bodily injury. These facts go a long way towards demonstrating that Richard reasonably believed that deadly force was necessary to defend himself from an imminent use of deadly force against him.

2. In his brief opposing summary judgment and his Statement of Material Facts, Napier argued that Richard could not see Napier when he came out of the sideroom inside the house from his position on the front porch, but Napier made no such arguments regarding Ronald, who was located in the driveway. In his brief in opposition to defendants' motion for summary judgment, Napier argued that "the poor evening light obscured Ramsdell's view into the camp," but this sentence in context clearly refers to Richard, not Ronald. In his Statement of Material Facts, Napier argued that it was lighter outside the house than inside and questioned "how well Ramsdell was actually able to see into the house from his position on the front porch." Again, Napier must have been referring to Richard because Richard was the officer on the front porch; Ronald was in the driveway.

house from his position in the driveway is irrelevant, because Napier came out to the open doorway, where he could be seen— and shot—by Ronald. Napier does not dispute that Ronald: (1) knew that Napier was possibly mentally disturbed; (2) knew that Richard had quickly retreated from Napier by jumping over the woodpile on the porch; and (3) saw Napier in the open doorway holding a gun. Consequently, Napier has not created a genuine issue as to whether Ronald knew that Napier placed Richard at a substantial risk of serious bodily injury. Rather, it has been conclusively established that Napier threatened Richard and placed him at risk of serious bodily injury, and it is undisputed that Ronald knew of those facts at the time he fired the first burst of bullets at Napier. Therefore, we do not disturb the magistrate's decision regarding the first burst of bullets fired by Ronald.

### 3. Ronald Ramsdell's Second Burst of Bullets

■ The magistrate found Ronald's second burst to be objectively reasonable based on his fear that Napier was going to shoot him when Napier turned to face him after the first burst of bullets. Because Napier was acquitted of charges of criminal threatening and reckless conduct toward Ronald, there is no collateral estoppel with regard to those issues. In making his determination regarding the reasonableness of the second burst, the magistrate relied on the "very short period of time involved, the plaintiff's failure to drop his gun, and the fact that the plaintiff does not contend that he did not hear Richard's and Ronald's repeated orders to drop his gun." In light of those three factors, the magistrate stated that Napier's denial that he raised his gun when he turned toward Ronald was not determinative.

We would agree with the magistrate's conclusion if the undisputed record was that Ronald: (1) saw that Napier held a firearm when Napier turned to face him;

(2) ordered Napier to drop his weapon; and (3) shot Napier when he refused to do so. However, Napier disputes whether the officers ever identified themselves or instructed him to drop his weapon. Contrary to the magistrate's statement, Napier did contend that he did not hear the officers identify themselves or order Napier to drop his gun. Napier also points to the testimony of neighbors who heard Napier shouting to his neighbor before the police arrived but did not hear any later yelling or shouting from the officers. From this, Napier contends that a reasonable jury could conclude that no such warnings were given by the officers.

■ At oral argument, Napier pointed out that he did argue below: (1) that neither he nor his neighbors heard the warnings that the Ramsdells claim to have given, and (2) that a reasonable jury could conclude that the Ramsdells did not in fact warn Napier of their presence or command him to drop his gun. However, these arguments were not made in Napier's brief in opposition to appellees' motion for summary judgment; rather, they were offered in the accompanying Statement of Material Facts. The argument section of Napier's brief was the proper place to outline all of his arguments in opposition to defendants' motion for summary judgment, including all of the alleged factual disputes. Nowhere in Napier's brief did he argue that a factual issue existed regarding whether the officers gave warnings to Napier before opening fire. We are reluctant to forgive the omission of an argument from an opposition brief merely because that argument was made in an accompanying statement of material facts. Because of Napier's failure to include this argument in his brief, the magistrate missed this factual dispute and erroneously stated that Napier "[did] not contend that he did not hear Richard's and Ronald's repeated orders to drop his gun."

However, these arguments were expressly outlined in Napier's Statement of Material Facts, an eleven-page document

that Napier was required to file with his opposition brief. Further, after the magistrate issued his recommended decision, Napier filed a statement of objections to that recommended decision. In that document, Napier specifically identified the factual dispute between the officers, who testified that they ordered him to drop his weapon, and Napier, who testified that he heard nothing. The district court's October 1, 1998 Order affirming the recommended decision stated that the district court: (1) reviewed the recommended decision and the entire record, and (2) made a *de novo* determination of all matters adjudicated by the recommended decision. Even though we can understand how the magistrate and district court could have missed the factual dispute buried in Napier's Statement of Material Facts, that factual dispute was reiterated in Napier's objections to the recommended decision. Finally, Napier's motion for oral argument was denied by the district court, depriving him of any last opportunity to point out the magistrate's error and to more prominently bring this dispute to the attention of the court. For these reasons, we reluctantly find that the factual dispute regarding whether warnings were given is part of the summary judgment record.

Nevertheless, we can affirm the district court's entry of summary judgment in favor of Ronald Ramsdell on any independently sufficient ground. *See Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 860 (1st Cir.1987). Even absent agreement that the officers warned Napier to drop his gun, we agree with the magistrate that no reasonable jury could find Ronald's conduct of firing the second burst of three bullets to be so deficient that no

reasonable officer could have made the same choice under the circumstances.

The established and undisputed circumstances facing Ronald at the time he made the decision to fire the second burst were as follows. The Ramsdells were investigating a complaint that Napier was firing a weapon from his home and were told that Napier might be mentally unstable. When Richard approached the house, Napier threatened him with a gun, recklessly creating a substantial risk of serious bodily injury to Richard. Richard responded by jumping behind a woodpile, scrambling around the corner of the house, and firing a shot at Napier, who continued to hold the gun. Ronald knew that his brother had leaped behind the woodpile in retreat, and he saw Napier, still holding his gun, emerge into the doorway. Fearing for his brother, Ronald fired the first burst of bullets at Napier, but Napier was not hit.[3] Rather than drop his gun, Napier then turned toward Ronald. It was at this point that Ronald fired the contested second burst.

We cannot find that the firing of the second burst was so deficient that no reasonable officer could have made the same decision. The facts established at Napier's criminal trial demonstrate that Ronald was correct in fearing that his brother had been threatened by a possibly mentally disturbed man with a gun and was at risk of serious bodily injury. Ronald fired a burst of three bullets and nothing changed: Napier did not fall to the ground, drop his gun, or otherwise indicate that the risk no longer existed. Instead, he turned to face Ronald, causing him to believe that he was now also placed at risk. All of this occurred within seconds. We agree that Napier's self-serving claim that he did not point his gun at Ronald is not determinative. After what had already occurred, Napier need not have specifically

---

**3.** Napier claims that the bullets that struck him came from the second burst, and appellees do not appear to have taken a position on this question. It is undisputed, however, that

Napier was still standing after the first burst and that he fell onto a bed just inside the door after the second burst.

pointed his gun at Ronald for Ronald to believe that the danger still existed and now also encompassed him. We must remember that the reasonableness of an officer's use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865. "The calculus of reasonableness must embody allowance for the fact that officers are often forced to make split-second judgments—in situations that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. Therefore, we agree with the magistrate that no reasonable jury could find that Ronald's conduct of firing the second burst of three bullets was so deficient that no reasonable officer could have made the same choice under the circumstances. At the very least, we find that Ronald *could have reasonably believed* that the second burst was justified and lawful due to the threat to his brother, the ineffectiveness of the first burst at ending that threat, and the quickly emerging apparent threat to himself. Therefore, under the standard enunciated in *Anderson,* Ronald is entitled to qualified immunity with regard to the second burst, whether Napier has alleged a viable Fourth Amendment violation or not. *See Anderson,* 483 U.S. at 641, 107 S.Ct. 3034.

### 4. Creation of Exigent Circumstances

■ Napier also argues that even if the officers' conduct was objectively reasonable given the exigent circumstances, the officers were the ones to blame for creating those exigent circumstances. Citing *St. Hilaire v. City of Laconia,* 71 F.3d 20 (1st Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2548, 135 L.Ed.2d 1068 (1996), Napier argues that the police cannot evoke exigencies of the moment created by ·their own unreasonable conduct as justification for inflicting deadly force that, but for their blunders, would never have been used. However, *St. Hilaire* does not stand for that proposition. In *St. Hilaire,*

we rejected the defendants' argument that the police officers' actions must be examined for reasonableness only at the moment of the shooting, opting instead to examine the officers' actions leading up to the shooting. *See id.* at 26. We then stated that the district court's focus on only the moment of the shooting led it to erroneously define the issue as whether there was any clearly established constitutional duty on the part of the police to avoid creating situations which increased the risk of the use of deadly force. *See id.* at 27. We specifically rejected this as the proper inquiry, and we did not pass on the existence of such a broad duty. *See id.*

Absent additional authority, we cannot agree that the Ramsdells' pre-confrontation actions should deprive their later conduct in response to Napier's actions of its reasonableness. Even under Napier's version of the events, the officers merely walked quietly around to the front door of Napier's house with their guns drawn, pursuant to a departmental procedure for responding to a shooting complaint. The cautious and covert manner in which the Ramsdells chose to approach the front of the house does not change the established fact that, once the officers encountered Napier, he threatened Richard Ramsdell with his gun and placed him at risk of serious bodily injury. The fact that the officers prepared themselves for exactly the behavior that Napier exhibited does not make their actions any less reasonable.

■ However, even though the Ramsdells' pre-confrontation actions do not deprive their later actions of their reasonableness, the pre-confrontation actions themselves could theoretically serve as the unreasonable conduct on which a § 1983 claim is based. As noted above, we stated in *St. Hilaire* that the police officers' actions leading up to the shooting must be examined for their reasonableness. *See St. Hilaire,* 71 F.3d at 26 (citing *Brower v. Inyo,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)). After rejecting the

district court's broad formulation of the inquiry (i.e. whether the duty to avoid creating situations which increase the risk of the use of violence was clearly established), we inquired whether the duty to "knock and announce" in executing a search warrant was clearly established. *See id.* at 27. Finding that no such duty was clearly established at the time of the incident, we held that the officers were entitled to qualified immunity. *See id.* at 28.

■ Although Napier's underlying theory that the armed officers caused the confrontation by surprising Napier is similar to the plaintiff's underlying theory in *St. Hilaire, see id.* at 27, the question of whether an officer must "knock and announce" before executing a search warrant is plainly not at issue here. Napier does not expressly outline the "clearly established" right or obligation that the Ramsdells allegedly breached with their pre-confrontation conduct. As noted above, the *St. Hilaire* court rejected as "broadly defined" the district court's formulation of the obligation as the duty "to avoid creating situations which increased the risk of use of deadly force." *Id.* To determine which more narrowly-drawn obligation Napier must be asserting as "clearly established," we can only analyze Napier's allegations of actions by the Ramsdells that created the confrontation. The only "blunder" that Napier identifies on appeal in arguing that the Ramsdells erred in allowing the situation to develop into a threatening one was that of sneaking around the house with their guns drawn, rather than telephoning Napier or contacting him from a position of cover. Napier cites no authority for the proposition that, in responding to a complaint of the discharge of a firearm, the officers have a duty to announce their presence to the shooter well before they reach the front door of the dwelling. Napier's assertion that the officers should have "called ahead" may

may not be a helpful suggestion to law enforcement, but Napier cites no authority that the Ramsdells had a clearly established duty to do so. Nor does he cite any authority for the proposition that the Ramsdells had a duty to refrain from approaching with their guns drawn in preparation for the potential danger of Napier's weapon being fired again. Therefore, like the officers in *St. Hilaire*, the Ramsdells are entitled to qualified immunity on this theory. *See id.* at 28. As a result, Napier's attempt to expand the scope of the scrutiny of the Ramsdells' actions to include those that occurred before the confrontation with Napier does not assist him in avoiding summary judgment.

### D. Conclusions Regarding Napier's § 1983 Claims

In sum, we agree with the district court that a jury could not find that the Ramsdells' conduct was so deficient that no reasonable officer would have made the same choice under the circumstances. Thus, summary judgment in favor of the Ramsdells on Napier's § 1983 cause of action was appropriate. Because the grant of summary judgment in favor of Lewsen and the Town was based upon the decision with respect to the Ramsdells, and because appellant makes no arguments that specifically address the § 1983 claims against Lewsen or the Town, we also affirm the grant of summary judgment in favor of Lewsen and the Town.

### III. State Law Tort Claims

Napier requests that we vacate the entry of judgment in favor of all defendants on his state law tort claims. Napier asserted: (1) claims for battery, assault, and negligence against the individual defendants, and (2) a claim against the Town for its "vicarious corporate liability" for the negligence of the individual defendants.[4] The magistrate recommended the entry of judgment against these state law tort

---

4. Napier also alleged state law civil rights claims against all defendants, but, apart from

his arguments regarding § 1983, he makes no attempt to resurrect them on appeal.

claims because: (1) Napier failed to respond to the Ramsdells' arguments that they were entitled to absolute immunity under 14 M.R.S.A. § 8111(1); (2) even if Napier had responded, the Ramsdells would be entitled to immunity under § 8111(1); (3) Lewsen was also entitled to § 8111(1) immunity for his allegedly negligent supervision and training of the Ramsdells; and (4) the Town could not bear vicarious liability for tort claims which were no longer viable.

■ Napier argues on appeal that summary judgment on his state law tort claims was erroneous because the defendants have failed to show that the Town has not waived its statutory immunities and those of its employees by procuring liability insurance. Under the Maine Tort Claims Act, employees of governmental entities are absolutely immune from personal civil liability for: (1) discretionary acts performed within the scope of their employment, and (2) intentional acts or omissions occurring in the scope of their employment. *See* 14 M.R.S.A. §§ 8111(1)(C) & (E). The Act also provides that towns and other governmental entities are immune from suit on all tort claims unless immunity is expressly removed by statute. *See* 14 M.R.S.A. § 8103(1); *Hill v. Lubec,* 609 A.2d 699, 700 (Me.1992). However, if a governmental entity procures insurance that provides coverage in areas where the governmental entity is immune under the Act, the entity waives its immunity, but only to the limits of the insurance coverage. *See* 14 M.R.S.A. § 8116; *Moore v. City of Lewiston,* 596 A.2d 612, 615–16 (Me.1991). As governmental immunity is an affirmative defense, the entity bears the burden of establishing that it had no insurance coverage for the plaintiff's claims. *See King v. Town of Monmouth,* 697 A.2d 837, 840 (Me.1997).

■ The district court addressed the waiver issue in its order affirming the recommended decision. Citing *Moore,* the district court observed that § 8116 "does

not waive immunity for otherwise immune municipal employees who have insurance; it does that only as to a government entity." In *Moore,* the Supreme Judicial Court of Maine found that summary judgment entered in favor of the City of Lewiston on a common law tort claim was inappropriate because the government entity did not produce evidence to show that it did not possess insurance coverage for the claim. *See Moore,* 596 A.2d at 615. The Court found that, under § 8116, the City of Lewiston could have waived its statutory immunities by procuring liability insurance coverage, so summary judgment on the basis of those immunities, without proof that no insurance applied, was premature. *See id.*

The *Moore* Court went on to hold, however, that § 8116 did not waive the personal liability of the individual police officers, who were employees of the City. *See id.* at 616. The Court noted the difference in the language of § 8116 with regard to entities and their employees:

> Section 8116 provides that a governmental entity "may purchase insurance ... on behalf of its employees to insure them against any personal liability for which a government entity is obligated to provide defense or indemnity under § 8112." However, unlike the parallel provision in section 8116 regarding government entities, which states that "the *governmental entity* shall be liable ... to the limits of the insurance coverage" (emphasis added), this provision does not purport to waive the personal immunity of insured employees. Thus, regardless of whether the City's insurance coverage extended to the defense or indemnity of the police officers, their personal immunity from liability could not have been waived.

*Id.* at 616 (footnote omitted).

The district court here acknowledged that some ambiguity results from the case cited by Napier, *Rippett v. Bemis,* 672 A.2d 82, 88–89 (Me.1996), but the court

still relied on *Moore*'s clear statement distinguishing the entity from the employee. In *Rippett,* the Court found a waiver of a sheriff's immunity because the Sheriff's Department carried insurance. *See id.* at 89. The district court here read *Rippett* as applying the insurance waiver of entity immunity and not employee immunity for four reasons: (1) the statutory language is clear in that the waiver applies to a "governmental entity"; (2) the *Moore* Court was explicit in stating that the waiver does not apply to employees; (3) *Rippett* does not overrule or even mention *Moore;* and (4) the Sheriff's Department in *Rippett* was in fact a governmental entity as to which insurance coverage would waive immunity. Therefore, the district court found that the immunity of Lewsen and the Ramsdells, as individual employees, could not have been waived by insurance coverage. From this, the district court found that the Town escapes liability on Napier's tort claims, not because the Town's immunity was in place, but because there were no viable claims against the employees for which the Town could be vicariously liable.

We express no opinion as to the district court's reading of *Rippett* as only applying § 8116 to waive the Sheriff's Department's entity immunity and not the sheriff's employee immunity. We need not attempt to distinguish *Rippett* because it is clear that the Supreme Judicial Court of Maine continues to adhere to the distinction drawn in *Moore* between entity immunity, which may be waived through the procurement of liability insurance, and employee immunity, which may not. *See Grossman v. Richards,* 722 A.2d 371, 376 (Me.1999) ("Section 8116 only affects the liability of governmental entities, and does not waive the immunity of the individual insured employees."). Therefore, the district court was correct in finding that there was no genuine issue as to whether the individual defendants waived their statutory immunity.

However, while the *Moore /Grossman* distinction applies here to entitle the individual employee defendants to summary judgment on Napier's state law tort claims, the Town is not similarly entitled. Contrary to the district court's determination, the immunity enjoyed by Lewsen and the Ramsdells does not relieve the Town of its vicarious municipal liability. " 'Under the doctrine of respondeat superior, a principal has no defense based on an agent's immunity from civil liability for an act committed in the course of employment.' " *Berard v. McKinnis,* 699 A.2d 1148, 1152 n. 9 (Me.1997) (quoting Restatement (Second) of Agency § 217(b)(ii) (1958)). In *Berard,* the Supreme Judicial Court of Maine stated that a waiver of governmental entity immunity under § 8116 "would expose [the entity] to liability despite [its employee]'s personal immunity from liability." *Id.*

Similarly, in *Moore,* as described above, the Supreme Judicial Court found that the individual officers' immunity may not be waived, but that the City's immunity may be waived. *See Moore,* 596 A.2d at 615–616. The Court then remanded for further proceedings on the vicarious liability negligence claim against the City. *See id.* at 617. The Court did not affirm the entry of summary judgment in favor of the City on the vicarious liability negligence claim simply because the negligence claims against the officers—for whom the City was potentially vicariously liable—failed due to the officers' statutory immunity. The City in *Moore* was still potentially vicariously liable for the actions of its officers, even though those officers enjoyed immunity from suit. The same is true for the Town here. Therefore, the district court erred in granting summary judgment in favor of the Town on Napier's claims of "vicarious corporate liability" for the negligence of the individual defendants.

### CONCLUSION

Based on the foregoing, we: (1) **VA-CATE** the entry of judgment in favor of

the Town of Windham with regard to Napier's claim of "vicarious corporate liability" for the negligence of Lewsen and the Ramsdells, and (2) **AFFIRM** the district court's decision in all other respects. This case is **REMANDED** to the district court for further proceedings consistent with this opinion.